AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of West Virginia

FILED

AUG 17 2010

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The Medical Office/Business Premises of<br>William J. Casto, D.O. | )<br>)<br>)<br>)<br>)<br>) |

Case No.  2:10-mj-00091

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
The Medical Office/Business Premises of William J. Casto, D.O., 146 Pinnell Street, Suite A, Ripley, WV  25271 (See Attachment A - photo/description of premises to be searched),
located in the _____ Southern _____ District of _____ West Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B - Items To Be Seized

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846, 841(a)(1),<br>843(2) and (3) and 18<br>U.S.C. 1347 and 2 | Conspiracy: to distribute controlled substances; obtain controlled substances<br>by fraud; and use a registration number issued to another person, and<br>distribution of controlled substances, health care fraud and aiding and abetting |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Mary Ann Withrow, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  July 19, 2010

*Judge's signature*

MARY E. STANLEY, United States Magistrate Judge
*Printed name and title*

City and state:  Charleston, West Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN THE MATTER OF THE SEARCH OF:

Medical Office/Business Premises of
William J. Casto, D.O.

Mag. Case No. 2:10-mj-00091

### ATTACHMENT A

### DESCRIPTION OF PREMISES TO BE SEARCHED

146 Pinnell Street, Suite A, Ripley, WV is a one-story red brick
building located within the property of Jackson General Hospital
located in Jackson County, WV.   Dr. Casto's office is located
within the second red brick building on the right entering from
Clay Lick Road.   There is a sign on the front of the building
reading "Jackson Medical Center".  Additionally, there is a sign in
the front lawn reading "William J. Casto, DO, Internal Medicine,
Office Hours 8AM - 5PM, Mon / Tues / Thurs / Fri".



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN THE MATTER OF THE SEARCH OF:

Medical Office/Business Premises of
William J. Casto, D.O.

Mag. Case No. 2:10-mj-00091

ATTACHMENT B - ITEMS TO BE SEIZED

The government seeks to seize the following items which are believed to be kept and maintained on the premises described in the Search Warrant:

(1)   With regard to the patients identified on the attached "Complete Patient Seizure List":

   (a)   Complete patient files and billing information, including but not limited to, clinical records, progress notes, charts, superbills, fee tickets, encounter forms, routing slips, and similar documents; patient bills, invoices, insurance claims, claim forms, CMS (HCFA) 1500 claims forms, explanations of benefits, copies of checks or electronic transfers of payments, billing and payment records, patient ledgers or account cards; all schedule books, calendars, appointment books, patient sign-in logs or sheets and similar records;

   (b)   All correspondence that in any way relates to the patients;

   (c)   All laboratory test orders and laboratory test results; and

   (d)   Any and all agreements with patients.

(2)   All documents and records reflecting general Medicare and Medicaid policies, transmittals, program memoranda, and other billing guidance;

(3)   All CPT Manuals or similar coding manuals or binders;

(4)   Any other documents, records and items that relate, in any way, to general medical coding or billing;

(5)   Any pre-signed or filled out prescriptions;

(6)   The computer hardware (and associated peripherals) associated with any and all computers maintained at the search site - for the purpose of making a mirror image;

(7)   With regard to Dr. Casto:

  (a)   Personal and business schedules, calendars, travel documents, telephone numbers, telephone messages; cellular phones and personal digital devices; and

  (b)   Any and all biographical, financial, and business documents, to include but not limited to memorandums, letters, correspondence; and

(8)   Any and all documents and records, contracts, writings, electronic mailings or other material indicating or relating to the receipt and payment of money to or from Stacie Smith or those individuals listed in the "Complete Patient Seizure List."

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN THE MATTER OF THE SEARCH OF:

Medical Office/Business Premises of
William J. Casto, D.O.

Mag. Case No. 2:10-mj-00091

## COMPLETE PATIENT SEIZURE LIST



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN THE MATTER OF THE SEARCH OF:

Medical Office/Business Premises of
William J. Casto, D.O.

Mag. Case No. 2:10-mj-00091

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

We, Mark A. Armstrong II and Mary Ann Withrow, being duly sworn, do hereby depose and state as follows:

## A. Introduction

1.   The information contained in this affidavit has been compiled through a joint investigation being conducted by Diversion Investigator (DI) Mark Armstrong, U.S. Department of Justice, Drug Enforcement Administration (DEA) and Special Agent (SA) Mary Ann Withrow, Department of Health and Human Services, Office of Inspector General (DHHS/OIG).   The information contained in the affidavit has been reviewed jointly by the affiants, and is true and correct to the best of our information, knowledge, and belief.

2.   I, Mark A. Armstrong, DEA DI assigned to Charleston, West Virginia.   I have been employed as an investigator with the DEA for approximately five years.   My responsibilities include the investigation of violations of the Controlled Substances Act (CSA) under Title 21 of the United States Code.   In conjunction with my

employment, I completed approximately 13 weeks of training at the Drug Enforcement Administration's Training Academy in Quantico, Virginia, regarding the diversion of controlled pharmaceuticals. Since completing the training in 2005, I have participated in dozens of investigations involving schemes to divert controlled substances in the Western District of Pennsylvania, the Southern District of West Virginia, and the Northern District of West Virginia. Based on my experience and training, I know that the diversion of controlled pharmaceuticals often involves a licensed physician who, for no legitimate medical purpose, prescribes controlled substances to individuals, often without providing legitimate medical examinations. In many cases, the physician then engages in the manipulation of records, invoices, and prescriptions to conceal the illegal diversion of controlled substances.

3. I, Mary Ann Withrow, am a SA for DHHS/OIG. I have been an HHS-OIG agent since 2002. In my capacity as an HHS-OIG agent, and through my past employment, I have received specialized training and/or have experience in the areas of illegal prescription drug distribution and conspiracy, drug diversion and health care fraud, as well as in the use and execution of search warrants. From 1998 to 2002, I was employed by the West Virginia Medicaid Fraud Control Unit (WVMFCU) as an investigator.

4. The information contained in this affidavit has been obtained by or provided to me by individuals knowledgeable of the

subject matter, including others in law enforcement who have provided me with information they have obtained during the ongoing investigation.   Therefore, this affidavit does not include every fact gathered during the course of this investigation, but simply includes sufficient facts to obtain the probable cause for a search warrant for Dr. William J. Casto's (D.O.) (Dr. Casto) medical office/business premises located at 146 Pinnell Street, Suite A, Ripley, WV 25271.

5.   This affidavit is made in support of an application for a search warrant to search and seize evidence of violations of 21 U.S.C. §§ 846, 843(a)(2) and (3), 841(a)(1) and 18 U.S.C. §§ 2 and 1347.   The location to be searched is the medical office/business premises of Dr. Casto, located at 146 Pinnell Street, Suite A, Ripley, WV 25271.   The subject premises is further described in Attachment A hereto, which is appended to my Affidavit and incorporated herein by reference.   The items that are the subject of the search and seizure applied for in this application and affidavit are described in Attachment B hereto, which is appended to my Affidavit and incorporated herein by reference.

## B. Investigation

6.   The DEA, the West Virginia State Police (WVSP), DHHS/OIG, and the Saint Albans, West Virginia, Police Department, Detective Division, are conducting an ongoing criminal investigation of Dr.

3

Casto. Dr. Casto's medical office/business premises are located at 146 Pinnell Street, Suite A, in Ripley, West Virginia. I know from my personal observation and from my review of documents and statements of others, that Dr. Casto, is a doctor of osteopathic medicine practicing in Ripley, West Virginia. Investigation indicates that Dr. Casto unlawfully distributed controlled substances to and through a woman with whom he had an extra-marital affair, who was murdered in December, 2009. Your affiants note that Dr. Casto is not suspected of being complicit with the woman's murder. Two other individuals have been charged in connection with the murder, and are currently pending trial in Kanawha County, West Virginia. Some of the unlawful prescriptions were obtained using Medicaid.

7. Dr. Casto is licensed as an osteopathic physician by the West Virginia Board of Osteopathy. Dr. Casto is also registered with the DEA and thus, has been authorized to prescribe controlled substances.

The investigation has also revealed that ▮▮▮▮▮▮▮▮ (who is now deceased) conspired with Dr. Casto and others in unlawfully distributing and obtaining the controlled substances and in committing health care fraud.

8. This activity indicated in the investigation may constitute the following and other criminal violations:

    (a)   21 U.S.C. § 846(a)(1), conspiracy to distribute controlled substances;

(b)   21 U.S.C. § 841(a)(1), distribution of controlled substances;

(C)   21 USC § 843 (a)(2), use of the DEA Registration Number of another individual;

(d)   21 U.S.C. § 843(a)(3), obtaining controlled substances by fraud;

(e)   18 U.S.C. § 1347, health care fraud; and

(f)   18 USC § 2. aiding and abetting.

### ██████ MURDER INVESTIGATION

9.   In January 2010, DEA DI Armstrong received information from Detective (Det.) Kevin Elkins, St. Albans Police Department, and Det. Larry Dodson, Kanawha County Sheriff's Department, regarding Dr. Casto. Det. Elkins reported that he was assigned to an investigation into the murder of ████████ which occurred in December 2009. According to Det. Elkins, a search of ████ vehicle uncovered a prescription pad belonging to Dr. Casto. In a subsequent interview of Dr. Casto by Det. Elkins and Det. Dodson, Dr. Casto confessed to an extramarital affair with ████ Dr. Casto denied providing ████ with his prescription pad. However, he claimed to have served as ████ "family physician." More specifically, Dr. Casto claimed to have treated ████ mother, ████, for cancer.

Det. Elkins informed DEA DI Armstrong that ████ boyfriend, ████, believed that Dr. Casto allowed ████ to forge prescriptions using his name. Moreover, ████ mother, ████

5

▓▓▓▓▓▓ denied being a patient of Dr. Casto.

10. In response to this information, DEA DI Armstrong accessed West Virginia Board of Pharmacy's Controlled Substance Monitoring Program, which is an online database of controlled substance prescriptions filled in West Virginia. This database revealed the existence of multiple controlled substance prescriptions in the names of ▓▓▓▓▓▓▓▓▓▓▓▓, and ▓▓▓▓▓▓▓▓▓ It also showed controlled substance prescriptions in the name of ▓▓▓▓▓▓▓▓ who, according to local news reports on ▓▓▓▓▓▓ murder, was ▓▓▓▓▓ friend. The database identified Dr. Casto as the prescriber.

**<u>INTERVIEWS</u>**

11. In February 2010, your affiants, along with Det. Elkins, interviewed ▓▓▓▓▓▓▓▓ mother, ▓▓▓▓▓▓▓▓. Investigators informed ▓▓▓▓▓▓ of the existence of approximately 35 prescriptions for hydrocodone and alprazolam in her name, issued under Dr. Casto's name and DEA registration number. In response, ▓▓▓▓▓▓ denied receiving these prescriptions. ▓▓▓▓▓ described herself as generally being in good health, with no sign of cancer. ▓▓▓▓▓▓ also denied being a regular patient of Dr. Casto. She did say that Dr. Casto had called-in one steroid prescription for her. ▓▓▓▓▓▓ knew of Dr. Casto through ▓▓▓▓▓ ▓▓▓▓▓ met Dr. Casto only on one occasion approximately seven years ago. Per ▓▓▓▓▓▓▓ met Dr. Casto while working at Dr. Casto's medical

14.   In April 2010, DEA DI Mark Armstrong and St. Albans Police Department Detective Kevin Elkins interviewed ██████████ boyfriend, █████████████. According to █████████████ met Dr. Casto approximately 9-10 years ago while working for Dr. Casto and "Dr. Stanton" as a medical technician in Kanawha City, West Virginia. At the time, ████████ said, Dr. Casto owned a residence across the street from the medical practice, where ██████ and other medical staff took smoking breaks. According to ████████, Dr. Casto allegedly raped ██████ inside his residence.

████████ informed investigators that, in order to "cover-up" the alleged rape, Dr. Casto agreed to purchase ██████ a house and a vehicle. Dr. Casto assisted ██████ with college expenses and provided ██████ money. He also illegally provided ██████ with controlled substances prescriptions in false names and gave ████████ blank prescriptions. ████████ recalled ██████ as saying, "He (i.e., Dr. Casto) owes me."

According to ████████, Dr. Casto began issuing controlled substance prescriptions to Smith in the names of ██████ and mother, ████████████. He reported that Dr. Casto progressed to providing ██████ with prescriptions in other names, and with blank prescriptions. ████████ stated that ██████ sold most of the controlled substances that she acquired from Dr. Casto.

practice in Kanawha City, West Virginia. Around this time, ████████████

reported, ██████████ accused Dr. Casto of raping her.

Thereafter, ████████████ stated that Dr. Casto began providing

████████ with substantial financial assistance in helping ████████

purchase a home and finance a Chevy Tahoe. ████████ indicated that

████████ and Dr. Casto also saw each other on Wednesdays and

Saturdays.

12. In February 2010, DEA DI Armstrong reviewed a video copy

of the interview between Det. Kevin Elkins, Det. Larry Dodson, and

Dr. Casto, which occurred on December 31, 2009. In the interview,

Dr. Casto stated he practiced internal medicine for Pleasant Valley

Hospital in Ripley, West Virginia. Dr. Casto claimed he met ████████

████████ around 2001. At that time, Dr. Casto worked for "Dr.

Stanton," who ████████ worked for as a medical assistant. Dr. Casto

and ████████ maintained an "on-again-and-off-again" extramarital

relationship. This relationship involved Dr. Casto providing ████████

"a lot" of money, which included a $60,000 house and two or three

vehicles.

When asked about the prescription pad found in ████████ vehicle,

Dr. Casto stated he saw ████████ on the Saturday before ████████ death

and provided her an antibiotic prescription for her son, ████████

Dr. Casto said he believed he left his prescription pad in ████████

vehicle by mistake. Dr. Casto stated that he sometimes met ████████

in Point Pleasant, West Virginia.

Dr. Casto admitted prescribing ████ Lortab (hydrocodone, a Schedule III controlled substance) and Xanax (alprazolam, a Schedule IV controlled substance) for, "what she said," was lower back pain associated with anesthesia which was related to child birth. Dr. Casto stated that ████ medical records should be on his computer system at work. Moreover, Dr. Casto informed investigators that he prescribed Lortab to ████ mother, ████ ████ "for a long time." According to Dr. Casto, ████ claimed that ████ had lung cancer. Dr. Casto disclosed he had several notes on ████ in a medical chart, and stated, "I have a record of everything I wrote."

When asked, Dr. Casto denied knowledge of drug abuse by ████ except for marijuana. Dr. Casto also denied being threatened or blackmailed by ████ into issuing illegal controlled substance prescriptions, or into providing ████ with blank prescriptions. Moreover, Dr. Casto denied receiving phone calls from pharmacies attempting to verify his prescriptions for ████ or other family members.

13.   In March 2010, your affiants interviewed ████ ████ was reportedly a friend of ████ and according to the West Virginia Controlled Substance Monitoring

Program, ███████ received approximately eight (8) hydrocodone and one (1) oxycodone prescription from Dr. Casto.[1]

███████ identified herself as a life-long friend of ███████ said that she met Dr. Casto only on one occasion. ███████ stated ███████ confided in her about the relationship between ███████ and Dr. Casto and that she ███████ sometimes babysat ███████ children when ███████ visited the doctor. ███████ stated that ███████ began by filling controlled substance prescriptions issued under Dr. Casto's name and DEA number in the names of ███████ and ███████ mother (i.e., ███████). However, ███████ progressed to using other names, including ███████ informed investigators that she learned about ███████ using her name in the winter of 2009. Per ███████ requested to borrow ███████ driver's license, and, upon returning it, admitted to filling a hydrocodone prescription in ███████ name. According to ███████ advised ███████ to not worry about getting into trouble because Dr. Casto wrote the prescription and would verify it.

Further questioning of ███████ revealed that ███████ was financially dependent on Dr. Casto. ███████ stated she overheard

_____

[1] Hydrocodone, oxycodone and alprazolam are highly addictive controlled substances which are the "drugs of choice" for many drug abusers. They are commonly traded and/or sold on the street for a profit. Oxycodone can sell on local streets for in excess of one dollar per milligram. Also, opiods, such as hydrocodone and/or oxycodone taken with alprazolam, are known to have a heightened affect on the user.

▮▮▮▮▮and Dr. Casto argue about money on the phone. According to ▮▮▮▮▮ ▮▮▮▮▮ claimed that Dr. Casto provided her with controlled substance prescriptions "to take care of her" when Dr. Casto could not give her money due to Internal Revenue Service (IRS) issues.[2] ▮▮▮▮▮stated she did not witness ▮▮▮▮sell pills. However, ▮▮▮▮talked about using the proceeds from selling pills to pay bills, etc.

▮▮▮▮▮ informed investigators that ▮▮▮▮illegally filled prescriptions in multiple names, including the name of ▮▮▮▮▮ mother, ▮▮▮▮▮▮▮▮▮ stated Dr. Casto "verified" a fraudulent prescription with a pharmacist at Loop Plaza Pharmacy in St. Albans, West Virginia. However, ▮▮▮▮▮did not know whether Dr. Casto actually wrote the prescriptions passed by ▮▮▮▮▮ According to ▮▮▮▮▮obtained one of Dr. Casto's blank prescription pads a couple of months before ▮▮▮▮death and another one the Saturday before her death.

In the course of interviewing ▮▮▮▮▮your affiants showed ▮▮▮▮▮a list of Dr. Casto's controlled substance prescriptions, filled by individuals in the St. Albans, West Virginia area. Your

---

[2]In September, 2003, Dr. Casto entered into a "Settlement Agreement and Release" with the United States, the State of West Virginia and a "relator" whereby he agreed to pay more than $332,000.00 to settle claims related to health care fraud. The financial pressure that resulted may have impacted his ability to provide financial support to ▮▮▮▮▮

affiants obtained this list from the West Virginia Controlled Substance Monitoring Program.

After reviewing the list, ███████████ identified the following individuals as potential associates of Smith in illegal activity related to prescriptions issued under Dr. Casto's name and DEA registration number:

| NAME | ASSOCIATION |
| --- | --- |
| Daniel Arbaugh | Possible relative of █████████ who lived with ██████ for several months. |
| Tricia Arbaugh | Possible relative of █████████ who lived with █████ for several months. |
| Adam Bailey | Allegedly lived on same street as ██████ |
| Eric Coleman | Possible friend of █████ nicknamed |
| Scott Johnson | ██████ friend |
| Joy Johnson | ██████ friend |
| Peggy Murray | █████████ friend |
| Tanette White | █████████ friend |
| James Harris | Possible relative of ████████ boyfriend |
| Charlene Means | █████████ sister |
| John Paul | ██████ father |
| Jennifer Payne | Possible friend of █████████ |
| Tracy Pennington | ██████ friend |
| Gary Ward | █████████ boyfriend |
| Ruth Field | Possible mother of ████████████ |
| Tarynn Skees | █████ friend |
| Brent Michaels | ██████████ boyfriend |
| Jared James | Possible friend of █████ |

11

14.   In April 2010, DEA DI Mark Armstrong and St. Albans Police Department Detective Kevin Elkins interviewed ███████████ boyfriend, █████████. According to █████████ met Dr. Casto approximately 9-10 years ago while working for Dr. Casto and "Dr. Stanton" as a medical technician in Kanawha City, West Virginia. At the time, ████████ said, Dr. Casto owned a residence across the street from the medical practice, where █████ and other medical staff took smoking breaks. According to █████, Dr. Casto allegedly raped █████ inside his residence.

████████ informed investigators that, in order to "cover-up" the alleged rape, Dr. Casto agreed to purchase █████ a house and a vehicle. Dr. Casto assisted █████ with college expenses and provided █████ money. He also illegally provided █████ with controlled substances prescriptions in false names and gave █████ blank prescriptions. █████ recalled █████ as saying, "He (i.e., Dr. Casto) owes me."

According to █████, Dr. Casto began issuing controlled substance prescriptions to Smith in the names of █████ and █████ mother, █████████. He reported that Dr. Casto progressed to providing █████ with prescriptions in other names, and with blank prescriptions. █████ stated that █████ sold most of the controlled substances that she acquired from Dr. Casto.

12

████████████ claimed to have sometimes traveled to Pt. Pleasant, West Virginia with ██████ where she was to meet Dr. Casto. ████████ stated that ██████ dropped him off at a local restaurant to wait while she met with Dr. Casto. ██████████ said that he observed prescriptions with false names after ██████ met with Dr. Casto. When asked, ████████████ declined to provide investigators with the names he observed on the illegal prescriptions.

████████████ denied assisting ██████ in illegally acquiring the controlled substances or distributing them, even though he admitted to abusing some of the oxycodone acquired by ████████ He denied knowledge of two (2) hydrocodone prescriptions, one (1) oxycodone prescription, and two (2) alprazolam prescriptions, filled in his name at Rite Aid in St. Albans, West Virginia.

15.  On May 13, 2010, DEA DI Armstrong and Det. Kevin Elkins interviewed ████████████. This interview was precipitated by the existence of a hydrocodone prescription and an alprazolam prescription filled in ████████████ name at K-Mart Pharmacy in St. Albans, West Virginia, on April 17, 2009. It should be noted that, according to pharmacy records, ██████████████ driver's license was presented to the filling pharmacy.

████████████ admitted to being a purchaser of "pills" from ████████ in January 2009 and February 2009. According to ████████████ asked ████████████ to start filling controlled substance prescriptions in March 2009. ████████████ stated that ████████ informed her

13

that Dr. Casto's money had been "frozen," so Dr. Casto supplied
██████ with illegal prescriptions to fill and sell for money. █████████
advised ████████ "He (i.e., Dr. CASTO) can write one in your name."

According to ████████ she filled hydrocodone and alprazolam
prescriptions on the behalf of █████ at K-Mart Pharmacy in March
2009 and April 2009, in the name of Dr. Casto.  Per ████████████
explained, "The doctor said if you want to keep doing it, you need
to see him one time, and he'll create a chart."

Around this time frame, ████████ said that she accompanied
██████ while ████████ filled prescriptions in false names. ████████
reported that she observed ████████ carrying one of Dr. Casto's blank
prescription pads in ████████ Chevy Tahoe. She recalled an incident
in which ██████ presented a controlled substance prescription at
Loop Plaza Pharmacy in St. Albans, West Virginia and when the
pharmacist questioned it, ████████ called Dr. Casto and said, "You
have to call Loop" to verify the prescription. A few minutes
thereafter, ████████ said, Dr. Casto called ██████ and told her he
verified the prescription. When asked by investigators, ████████
denied remembering the name on the prescription.

████████ said she declined to fill prescriptions for
after April 2009. According to ████████████ she had begun addiction
treatment. When asked by investigators, ████████ provided an
additional name used by ████████ to illegally acquire controlled
substances, ████████████

14

16.  On May 13, 2010, DEA DI Armstrong and Det. Kevin Elkins interviewed ████████████ Investigators interviewed ███████ in response to the existence of three (3) hydrocodone prescriptions, two (2) oxycodone prescriptions, and (3) alprazolam prescriptions in ████████ name. Two of these prescriptions, filled at Loop Plaza Pharmacy on April 8, 2009, include the inscription, "Verified Dr. CASTO 4/8/09 8:00 pm EM." It should be noted that your affiants believe these two prescriptions to be the "questioned" prescriptions referred to by ██████████████ and ███████████ previously in this affidavit.

Investigators Armstrong and Elkins disclosed to ███████████ the existence of prescriptions in her name by Dr. Casto. Immediately, ███████ denied even knowing a Dr. Casto. Investigators informed ███████ that her driver's license was presented to pharmacists in the course of filling some of these prescriptions. In response, ███████ continued to deny involvement with the prescriptions in her name, informing investigators she lost her driver's license for about a month in 2009. According to ███████ she reacquired the license from a friend, ██████████████████████.

Despite her denial of involvement with the prescriptions in her name, ████████ stated she knew █████████ as an acquaintance through ███████ boyfriend, ████████████████ said she knew that ██████ was involved with a doctor, but did not know the name of the doctor.

15

17.   On May 13, 2010, DEA DI Armstrong and Detective Kevin Elkins interviewed ██████████ who was identified by ████████ as the boyfriend of ████████████████ friend. This interview was precipitated ten (10) hydrocodone prescriptions and three (3) oxycodone prescriptions in ██████ and ██████████ names.

██████ verified that he was the live-in boyfriend of ████████████ and that ████████ and ████ were friends prior to ████████ death. ██████ confessed that he filled two (2) hydrocodone prescriptions, on the behalf of ██████ at the Rite Aid Pharmacy in St. Albans, West Virginia. Ward informed investigators that ████████████ filled a few controlled substance prescriptions as well. ████████ stated that to the best of his knowledge, these prescriptions were issued by Dr. Casto, even though neither ██████ nor ████████ were treated by Dr. Casto. ██████ said that he and █████████████ received money from ██████ for their willingness to fill the prescriptions.

According to ██████████ filled controlled substance prescriptions in ██████ name on other occasions without his knowledge. Even though he did not know the details of the relationship between Dr. Casto and ██████████ said that he knew that Dr. Casto was "taking care" of ██████.

18.   On May 26, 2010, your affiants interviewed ████████ identified by ████████████ as a possible friend of ████████

16

███████ This interview was precipitated by the existence of seven (7) hydrocodone prescriptions, five (5) alprazolam prescriptions, and two (2) oxycodone prescriptions in ████████ name, filled under the DEA registration of Dr. Casto. It also was precipitated by the interview of a registered pharmacist (Rph) who worked at Rite Aid Pharmacy in Nitro, West Virginia. The Pharmacist informed DEA DI Armstrong that he called Dr. Casto's medical office regarding the prescriptions in ██████ name, which "verified" ████████ status as a patient.

████████ informed investigators that he has neither seen nor been treated by Dr. Casto. He said that he knew of Dr. Casto through ████████████ the deceased girlfriend of longtime friend, ██████████ ████████████ stated he believed that Dr. Casto provided ████████ a prescription pad to write prescriptions for controlled substances under various names. In turn, ██████████ said, ████████ filled the prescriptions and sold the pills.

According to ████████████ operated this scheme for a while before approaching ████████ to assist. ████████ said that he filled approximately 6-8 controlled substance prescriptions at Fruth Pharmacy in Nitro, West Virginia, Rite Aid in Nitro, West Virginia, and Rite Aid in St. Albans, West Virginia. In return, ████████ said that he received money or pills. ████████ informed ████████ that Dr. Casto had created a patient file in ████████ name, ████████ said.

17

19.   In the course of this investigation, your affiants utilized the West Virginia Board of Pharmacy's Controlled Substance Monitoring Program to identify controlled substance prescriptions filled in Stacie Smith's name, and in the names of individuals identified as ████████ family or associates. Those prescriptions attributable to the DEA registration number of Dr. Casto are delineated as follows:

| Name | Date Filled | Drug Description | Qty | Pharmacy |
|---|---|---|---|---|
| | 7/1/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 2/6/2009 | HYDROCODONE | 120 | LOOP PLAZA DIS |
| | 2/12/2009 | ALPRAZOLAM | 90 | LOOP PLAZA DIS |
| | 3/12/2009 | HYDROCODONE | 90 | K MART PHARMAC |
| | 4/8/2009 | ALPRAZOLAM | 90 | LOOP PLAZA DIS |
| | 4/8/2009 | OXYCODONE | 90 | LOOP PLAZA DIS |
| | 5/13/2009 | ALPRAZOLAM | 90 | LOOP PLAZA DIS |
| | 5/13/2009 | HYDROCODONE | 90 | LOOP PLAZA DIS |
| | 7/15/2009 | HYDROCODONE | 90 | CVS PHARMACY |
| | 8/24/2009 | HYDROCODONE | 90 | CVS PHARMACY |
| | 12/2/2009 | HYDROCODONE | 90 | CVS PHARMACY |
| | 6/4/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 7/6/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 8/22/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | 9/19/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | 11/2/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | 12/1/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | 2/11/2009 | HYDROCODONE | 120 | K MART PHARMAC |
| | 2/18/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 4/29/2007 | HYDROCODONE | 10 | RITE AID OF WE |
| | 5/12/2007 | HYDROCODONE | 90 | RITE AID OF WE |
| | 6/20/2007 | HYDROCODONE | 90 | RITE AID OF WE |
| | 7/26/2007 | HYDROCODONE | 90 | RITE AID OF WE |
| | 8/22/2007 | HYDROCODONE | 90 | RITE AID OF WE |
| | 9/27/2007 | HYDROCODONE | 90 | RITE AID OF WE |
| | 11/7/2007 | HYDROCODONE | 90 | RITE AID OF WE |
| | 12/8/2007 | HYDROCODONE | 90 | RITE AID OF WE |
| | 1/15/2008 | HYDROCODONE | 90 | RITE AID OF WE |

| | | | | |
|---|---|---|---|---|
| | 2/13/2008 | HYDROCODONE | 90 | RITE AID OF WE |
| | 3/12/2008 | HYDROCODONE | 90 | RITE AID OF WE |
| | 5/4/2008 | HYDROCODONE | 90 | RITE AID OF WE |
| | 8/27/2008 | HYDROCODONE | 90 | RITE AID OF WE |
| | 10/1/2008 | HYDROCODONE | 90 | RITE AID OF WE |
| | 11/1/2008 | HYDROCODONE | 90 | RITE AID OF WE |
| | 12/8/2008 | HYDROCODONE | 90 | RITE AID OF WE |
| | 12/31/2008 | HYDROCODONE | 90 | RITE AID OF WE |
| | 2/1/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 3/4/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 3/4/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 4/2/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 4/2/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 5/6/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 5/6/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 6/8/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 6/8/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 7/10/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 7/10/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 8/16/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 9/15/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 9/15/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 10/16/2009 | HYDROCODONE | 90 | LOOP PLAZA DIS |
| | 11/20/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 11/20/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 12/16/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 4/25/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 2/5/2009 | HYDROCODONE | 120 | FRUTH PHARMACY |
| | 3/16/2009 | ALPRAZOLAM | 60 | RITE AID OF WE |
| | 3/24/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | 4/24/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 4/24/2009 | OXYCODONE | 90 | FRUTH PHARMACY |
| | 5/22/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 6/18/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 6/18/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 7/21/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 7/21/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 8/7/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 9/9/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 9/9/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 10/6/2009 | HYDROCODONE | 90 | FRUTH PHARMACY |
| | 4/17/2009 | ALPRAZOLAM | 90 | K MART PHARMAC |
| | 4/17/2009 | HYDROCODONE | 90 | K MART PHARMAC |

| | | 3/26/2009 | HYDROCODONE | 90 | CVS PHARMACY |
|---|---|---|---|---|---|
| | | 3/27/2009 | HYDROCODONE | 90 | KROGER PHARMAC |
| | | 5/6/2009 | HYDROCODONE | 90 | KROGER PHARMAC |
| | | 6/8/2009 | HYDROCODONE | 90 | KROGER PHARMAC |
| | | 7/9/2009 | HYDROCODONE | 90 | KROGER PHARMAC |
| | | 8/22/2009 | HYDROCODONE | 90 | KROGER PHARMAC |
| | | 9/28/2009 | HYDROCODONE | 90 | KROGER PHARMAC |
| | | 10/30/2009 | HYDROCODONE | 90 | KROGER PHARMAC |
| | | 11/28/2009 | HYDROCODONE | 90 | KROGER PHARMAC |
| | | 12/28/2009 | OXYCODONE | 90 | KROGER PHARMAC |
| | | 6/15/2009 | OXYCODONE | 90 | LOOP PLAZA DIS |
| | | 7/16/2009 | HYDROCODONE | 90 | KROGER |
| | | 8/28/2009 | HYDROCODONE | 90 | KROGER |
| | | 10/23/2009 | HYDROCODONE | 90 | KROGER |
| | | 11/25/2009 | HYDROCODONE | 90 | KROGER |
| | | 7/8/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | | 7/8/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | | 8/27/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | | 8/27/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | | 10/10/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | | 2/12/2009 | HYDROCODONE | 120 | WAL-MART PHARM |
| | | 7/15/2009 | OXYCODONE | 90 | LOOP PLAZA DIS |
| | | 11/6/2009 | HYDROCODONE | 90 | LOOP PLAZA DIS |
| | | 3/4/2009 | OXYCODONE | 90 | FRUTH PHARMACY |
| | | 6/14/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | | 7/24/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | | 2/22/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | | 5/14/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | | 6/20/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | | 8/20/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | | 9/21/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | | 11/2/2009 | HYDROCODONE | 90 | LOOP PLAZA DIS |
| | | 11/30/2009 | HYDROCODONE | 90 | LOOP PLAZA DIS |
| | | 5/21/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | | 6/17/2009 | ALPRAZOLAM | 90 | WAL-MART PHARM |
| | | 6/17/2009 | HYDROCODONE | 90 | WAL-MART PHARM |
| | | 7/23/2009 | OXYCODONE | 90 | WAL-MART PHARM |
| | | 7/27/2009 | ALPRAZOLAM | 90 | WAL-MART PHARM |
| | | 1/30/2006 | ALPRAZOLAM | 90 | CVS PHARMACY |
| | | 5/2/2006 | ALPRAZOLAM | 30 | CVS PHARMACY |
| | | 6/20/2006 | ALPRAZOLAM | 30 | CVS PHARMACY |
| | | 10/28/2006 | HYDROCODONE | 45 | CVS PHARMACY |
| | | 10/28/2006 | ALPRAZOLAM | 30 | CVS PHARMACY |

| | | | |
|---|---|---|---|
| 11/7/2006 | HYDROCODONE | 45 | CVS PHARMACY |
| 11/7/2006 | ALPRAZOLAM | 30 | CVS PHARMACY |
| 11/20/2006 | ALPRAZOLAM | 60 | CVS PHARMACY |
| 11/20/2006 | HYDROCODONE | 60 | CVS PHARMACY |
| 12/10/2006 | HYDROCODONE | 90 | CVS PHARMACY |
| 12/11/2006 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 1/10/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 1/10/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 2/10/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 2/10/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 3/19/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 3/19/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 4/23/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 4/23/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 5/24/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 5/24/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 6/27/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 6/27/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 7/26/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 7/26/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 8/27/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 8/27/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 9/21/2007 | OXYCODONE | 24 | RITE AID OF WE |
| 9/27/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 9/27/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 11/7/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 11/7/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 12/8/2007 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 12/8/2007 | HYDROCODONE | 90 | CVS PHARMACY |
| 1/9/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 1/9/2008 | HYDROCODONE | 90 | CVS PHARMACY |
| 2/12/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 2/12/2008 | HYDROCODONE | 90 | CVS PHARMACY |
| 3/12/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 3/12/2008 | HYDROCODONE | 90 | CVS PHARMACY |
| 5/6/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 5/6/2008 | HYDROCODONE | 90 | CVS PHARMACY |
| 7/9/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 7/9/2008 | HYDROCODONE | 90 | CVS PHARMACY |
| 8/27/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 8/27/2008 | HYDROCODONE | 90 | CVS PHARMACY |
| 10/1/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| 10/1/2008 | HYDROCODONE | 90 | CVS PHARMACY |

21

| | | | | |
|---|---|---|---|---|
| | 11/1/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| | 11/1/2008 | HYDROCODONE | 90 | CVS PHARMACY |
| | 12/3/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| | 12/3/2008 | HYDROCODONE | 90 | CVS PHARMACY |
| | 12/30/2008 | ALPRAZOLAM | 90 | CVS PHARMACY |
| | 12/30/2008 | HYDROCODONE | 90 | CVS PHARMACY |
| | 1/31/2009 | ALPRAZOLAM | 120 | CVS PHARMACY |
| | 1/31/2009 | HYDROCODONE | 120 | CVS PHARMACY |
| | 3/4/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 3/9/2009 | OXYCODONE | 120 | CVS PHARMACY |
| | 4/2/2009 | ALPRAZOLAM | 90 | KROGER |
| | 4/6/2009 | OXYCODONE | 90 | CVS PHARMACY |
| | 5/8/2009 | ALPRAZOLAM | 90 | WAL-MART PHARM |
| | 5/8/2009 | OXYCODONE | 90 | KROGER |
| | 6/8/2009 | ALPRAZOLAM | 90 | CVS PHARMACY |
| | 6/8/2009 | OXYCODONE | 90 | CVS PHARMACY |
| | 7/10/2009 | ALPRAZOLAM | 90 | WAL-MART PHARM |
| | 7/10/2009 | OXYCODONE | 90 | WAL-MART PHARM |
| | 8/16/2009 | OXYCODONE | 90 | CVS PHARMACY |
| | 9/13/2009 | OXYCODONE | 90 | WAL-MART PHARM |
| | 10/15/2009 | OXYCODONE | 90 | WAL-MART PHARM |
| | 10/15/2009 | CLONAZEPAM | 15 | WAL-MART PHARM |
| | 11/16/2009 | OXYCODONE | 90 | WAL-MART PHARM |
| | 12/15/2009 | OXYCODONE | 90 | WAL-MART PHARM |
| | 10/2/2009 | ALPRAZOLAM | 90 | DRUG EMPORIUM |
| | 10/2/2009 | HYDROCODONE | 90 | DRUG EMPORIUM |
| | 5/13/2009 | HYDROCODONE | 90 | KROGER |
| | 6/20/2009 | HYDROCODONE | 90 | KROGER |
| | 8/7/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | 9/10/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 10/13/2009 | HYDROCODONE | 90 | LOOP PLAZA DIS |
| | 11/13/2009 | HYDROCODONE | 90 | LOOP PLAZA DIS |
| | 2/25/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | 3/23/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 3/23/2009 | HYDROCODONE | 90 | RITE AID OF WE |
| | 4/21/2009 | ALPRAZOLAM | 90 | RITE AID OF WE |
| | 4/21/2009 | OXYCODONE | 90 | RITE AID OF WE |
| | 3/19/2009 | OXYCODONE | 90 | RITE AID OF WE |

In the course of this investigation, your affiant reviewed pharmacy records pertaining to the above listed prescriptions.  Your affiant learned that West Virginia Medicaid covered the cost of multiple prescriptions filled in the names of ████████████████████ ████████████████ and ████████████  In addition, a private medical insurer covered the cost of prescriptions filled in the name of ████████████

20.  Based on the aforementioned sections of this affidavit, your affiants have probable cause to believe that the above-listed controlled substances prescriptions are not valid, as defined by 21 CFR 1306.04(a), and therefore are illegal. Moreover, your affiants utilized administrative subpoenas to obtain many of the original hard copies of the above-listed prescriptions. A review of these prescriptions indicated Dr. Casto's medical practice as being located at 146 Pinnell Street, Suite A, Ripley, West Virginia 25271.

C. Controlled Substance Violations

21.  At all relevant times, Dr. Casto possessed a valid DEA registration in West Virginia and was authorized to prescribe controlled substances.

22.  A physician who wishes to possess, distribute, dispense, or prescribe controlled substances as part of his or her professional practice must do so pursuant to a DEA registration (21

23

U.S.C. § 822; 21 C.F.R. 1301.11).   A prescription for a controlled substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. 21 C.F.R. 1306.04(a). It is a violation of 21 U.S.C. § 843(a)(2) to use a DEA registration number issued to another person to distribute controlled substances.

23. A physician violates 21 U.S.C. § 841 (unlawful distribution of controlled substances) when: (a) the physician distributes or dispenses a controlled substance; (b) the physician acts knowingly and intentionally; and (c) the physician's actions are not for a legitimate medical purpose in the usual course of his professional medical practice or are beyond the bounds of medical practice.

24. The term "controlled substance" means a drug or other substance included in Schedules I, II, III, IV and V as contained in 21 U.S.C. § 812 and 21 C.F.R. 1308.11, 12, 13, 14 and 15. As used in this affidavit and pursuant to Title 21, United States Code, Section 812 and Title 21, C.F.R. Section 1308.12(b), Oxycodone is a schedule II controlled substance. According to the 2010 edition of the of the PDR, Oxycodone is indicated for the relief of moderate to moderately severe pain.  It warns that Oxycodone is sought by drug abusers and is subject to criminal diversion.

25.   As used in this affidavit and pursuant to Title 21, United States Code, Section 812 and Title 21, C.F.R. Section 1308.13 (e), Hydrocodone is a schedule III controlled substance. Hydrocodone is marketed under the brand names of Lorcet, Lortab, Vicodin, and Norco, as well as numerous generic combinations. According to the 2010 edition of the PDR, Hydrocodone is indicated for the relief of moderate to moderately severe pain.

26.   As used in this affidavit and pursuant to Title 21, United States Code, Section 812 and Title 21, C.F.R., Section 1308.14 (c), Alprazolam is a schedule IV controlled substance of the benzodiazepine class. Alprazolam is marketed under the brand names Xanax and Niravam. According to the official website for the United States Food and Drug Administration (FDA), Alprazolam is indicated for the management of anxiety disorder or short-term relief of anxiety symptoms.   It states that psychological dependence is a risk with Alprazolam, especially in patients with a history of alcohol or drug abuse.   It advises that addiction-prone individuals should be under close medical supervision when receiving Alprazolam.

27.   Based on your affiant's experience with investigations involving illicit distribution and uses of pharmaceutical drugs, I know that the above-described controlled substances are presently highly subject to abuse and are available in the illicit

25

marketplace, not only in the Southern District of West Virginia, but also throughout the United States.

28. As used in this affidavit and pursuant to Title 21, C.F.R., Section 1300.01 (35), the term "prescription" is an order for medication dispensed to or for an ultimate user, but does not include an order for medication that is dispensed for immediate administration to the ultimate user. As further used in this affidavit and pursuant to Title 21, C.F.R., Section 1306.04(a), "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is imposed primarily on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

26

29.  This investigation is the result of efforts by the DEA, HHS-OIG, and St. Albans Police Department. These efforts included, but were not limited to, the interviewing and debriefings of witnesses; the interviewing of Dr. Casto himself; search of a seized vehicle; examinations of profiles of controlled substances prescribed by Dr. Casto; and an analysis of subpoenaed documents and other records.

30.  As the result of these efforts, law enforcement learned that Dr. Casto issued multiple controlled substance prescriptions without a legitimate medical purpose, and/or outside the usual course and bounds of medical practice, apparently for the monetary benefit of his mistress, ███████████ in violation of Title 21, United States Code, Code 846, 841(a)(1), 843(2) and (3) and 18 U.S.C. § 1347 and 2. This affidavit demonstrates probable cause that evidence of criminal activity will be found at Dr. Casto's medical practice.  Law enforcement identified several of these illegal controlled substance prescriptions as being issued under Dr. Casto's name and DEA number and billed to either West Virginia Medicaid or private medical insurance, in violation of 18 U.S.C. §§ 2 and 1347.

31.   Both hydrocodone and alprazolam are popular drugs of abuse that are commonly obtained by fraud, diverted and sold on the streets for a profit.  Taken together they can produce a heightened affect for the drug user/abuser.

32. The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance 21 U.S.C. § 802(11).  This includes issuing prescriptions.

## C. Knowledge based on Experience and Training

33.   Based on your affiant, Mark Armstrong's training and experience as a diversion investigator, your affiant, Mark Armstrong knows that the Controlled Substances Act (CSA) establishes a "closed system" of distribution that regulates the movement of controlled substance prescription medications from importation or manufacture through their delivery to the ultimate user patient via the dispensing, administering, or prescribing pursuant to the lawful order of a practitioner.  Prescriptions issued not in the "usual course of professional treatment" are not "prescriptions" for purposes of the CSA and individuals issuing and filling such purported prescriptions are subject to the penalties for violating the CSA's controlled substances provisions.

34. Based upon my experience, training, and background; my participation in illegal drug distribution operations and

28

investigations; and my conversations with other experienced law enforcement agents/officers with whom I have been associated, I know that:

a. persons involved in the illegal distribution of prescription drugs, including controlled substances, commonly maintain in their residences and businesses (including medical offices) notes, phone numbers, memorandums, books, papers, patient files and business documents relating to the illegal prescription drug activity and/or associates involved in the illegal activity, which are often kept as computer data files in computers or data in cell phones and personal digital assistants.

b. persons involved in the illegal distribution of prescription drugs, including controlled substances, take or cause to be taken photographs of themselves, their associates, their property and their product. These individuals often maintain these photographs in their residences and businesses, which are often kept as computer data files in computers or data in cell phones and personal digital assistants.

29

D. Computer Data

35.  From my experience and training in investigating white collar fraud, I know that individuals engaged in crimes such as these often maintain records pertaining to their crimes as well as instrumentalities and fruits of their crimes at their businesses and residences.  Often this information is stored on computer systems as well as "hard" physical copies.  I know from my training and experience that cellular telephones, computer hardware, software, PDS's, documentation, passwords and data security devices may be important to a criminal investigation in two distinct respects:

    A.    The objects themselves may be instrumentalities, fruits or evidence of crime; and/or

    B.    The objects themselves may have been used to collect and store information about crimes (in the form of electronic data).

36.  Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory

30

chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

A.  Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

B.  Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a

31

complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

C.  Typically, the volume of data stored on many computer systems and storage devices will be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

D.  Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files.  However, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by

32

using encryption, which means that a password or device, such as a "dongle" or "keycard", is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography".   For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.   Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

37.   Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords and data security devices which are (1) instrumentalities, fruits of evidence of crime, or (2) storage devices for information about crime.   I also know from my training and experience as an agent that computer storage devices can store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, he/she will often store it in random order with deceptive file names.   This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.   This sorting process can take weeks or months, depending on the volume of the data stored,

33

and it would be impractical to attempt this kind of data search on site.

38.   Furthermore, I know from my training and experience as an agent that searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.   The wide variety of computer hardware and software available requires even computer experts to specialize in some systems and applications.   Consequently, it is difficult to know before a search which expert should analyze the system and its data.

39.   In light of this information and these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to make mirror images and/or copies of the computer hard drives and to conduct an off-site search of the hardware for the evidence described.

D. Conclusion

Based upon the aforementioned, your affiants have probable cause to believe that, as late as December, 2009,  in the Southern District of West Virginia, Dr. Casto and others committed the crimes of conspiracy to: distribute controlled substances; obtain controlled substances by fraud and use of a registration number issued to another person, and distribution of controlled

substances, health care fraud/aiding and abetting, in violation of Title 21, United States Code, Sections 846, 841(a)(1), 843(2) and (3) and Title 18, United States Code, Sections 1347 and 2.

In addition, your affiants have probable cause to believe that evidence of those crimes, specifically the items set forth on Attachment B hereto, will currently be found in the medical office/business premise of Dr. Casto, 146 Pinnell Street, Suite A, Ripley, West Virginia 25271.

The above information is true and correct to the best of my knowledge, information and belief.

_____
Mary Ann Withrow
Special Agent, United States Department
Of Health and Human Services, Office of
Inspector General

_____
Mark Armstrong
Diversion Investigator, United States
Department of Justice, Drug Enforcement
Administration

Subscribed and sworn to before me July _19th_ of 2010

_____
MARY E. STANLEY
United States Magistrate Judge

35

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN THE MATTER OF THE SEARCH OF:

Medical Office/Business Premises of
William J. Casto, D.O.

Mag. Case No. 2:10-mj-00091

### ATTACHMENT A

### DESCRIPTION OF PREMISES TO BE SEARCHED

146 Pinnell Street, Suite A, Ripley, WV is a one-story red brick building located within the property of Jackson General Hospital located in Jackson County, WV. Dr. Casto's office is located within the second red brick building on the right entering from Clay Lick Road. There is a sign on the front of the building reading "Jackson Medical Center". Additionally, there is a sign in the front lawn reading "William J. Casto, DO, Internal Medicine, Office Hours 8AM - 5PM, Mon / Tues / Thurs / Fri".



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


IN THE MATTER OF THE SEARCH OF:

Medical Office/Business Premises of
William J. Casto, D.O.

Mag. Case No. 2:10-mj-00091


ATTACHMENT B - ITEMS TO BE SEIZED

The government seeks to seize the following items which are
believed to be kept and maintained on the premises described in
the Search Warrant:

(1)  With regard to the patients identified on the attached
     "Complete Patient Seizure List":

     (a)  Complete patient files and billing information,
          including but not limited to, clinical records,
          progress notes, charts, superbills, fee tickets,
          encounter forms, routing slips, and similar
          documents; patient bills, invoices, insurance
          claims, claim forms, CMS (HCFA) 1500 claims forms,
          explanations of benefits, copies of checks or
          electronic transfers of payments, billing and
          payment records, patient ledgers or account cards;
          all schedule books, calendars, appointment books,
          patient sign-in logs or sheets and similar records;

     (b)  All correspondence that in any way relates to the
          patients;

     (c)  All laboratory test orders and laboratory test
          results; and

     (d)  Any and all agreements with patients.

(2)  All documents and records reflecting general Medicare and
     Medicaid policies, transmittals, program memoranda, and
     other billing guidance;

(3)  All CPT Manuals or similar coding manuals or binders;

(4)  Any other documents, records and items that relate, in
     any way, to general medical coding or billing;

(5)   Any pre-signed or filled out prescriptions;

(6)   The computer hardware (and associated peripherals) associated with any and all computers maintained at the search site - for the purpose of making a mirror image;

(7)   With regard to Dr. Casto:

   (a)   Personal and business schedules, calendars, travel documents, telephone numbers, telephone messages; cellular phones and personal digital devices; and

   (b)   Any and all biographical, financial, and business documents, to include but not limited to memorandums, letters, correspondence; and

(8)   Any and all documents and records, contracts, writings, electronic mailings or other material indicating or relating to the receipt and payment of money to or from Stacie Smith or those individuals listed in the "Complete Patient Seizure List."

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

IN THE MATTER OF THE SEARCH OF:

Medical Office/Business Premises of
William J. Casto, D.O.

Mag. Case No. 2:10-mj-00091

## COMPLETE PATIENT SEIZURE LIST

